**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

KRISTLE AUTREY,                                    *
1839 Aberdeen Circle
Crofton, Maryland 21114                            *

and                                                *

ADREAN MORRIS,                                     *
1839 Aberdeen Circle
Crofton, Maryland 21114                            *

      Plaintiffs                             *

v.                                                 *

STATE OF MARYLAND,                                 *

    Serve:                                        *

    Nancy K. Kopp, Treasurer                      *
    80 Calvert Street
    Annapolis, Maryland 21401                     *

    Douglas Gansler,                              *
    Attorney General
    Office of the Attorney General
    200 Saint Paul Place                          *
    Baltimore, Maryland 21202
                                                   *
and
                                                   *
MARYLAND DEPARTMENT OF
PUBLIC SAFETY AND                                  *
CORRECTIONAL SERVICES,
                                                   *
    Serve:
                                                   *
    Gregg Hershberger, Secretary
    300 E. Joppa Road, Suite 100                  *
    Towson, Maryland 21286
                                                   *
    Douglas Gansler,
    Office of the Attorney General                *
    200 Saint Paul Place
    Baltimore, Maryland 21202                     *

    Defendants

Case No. _____

## COMPLAINT AND JURY DEMAND

COME NOW the Plaintiffs, Kristle Autrey and Adrean Morris, by counsel, and sue the Defendants, State of Maryland and Maryland Department of Public Safety and Correctional Services, and for cause state as follows:

### The Parties and Related Entities

1.      Plaintiff Kristle Autrey is a resident of the State of Maryland, who resides at 1839 Aberdeen Circle, Crofton, Maryland 21114. She was employed by Defendants as a correctional officer at Brockbridge Correctional Facility in Jessup, Maryland until her termination in September 2012.

2.      Plaintiff Adrean Morris is a resident of the State of Maryland, who resides at 1839 Aberdeen Circle, Crofton, Maryland 21114. He is employed by Defendants as a correctional officer at Brockbridge Correctional Facility in Jessup, Maryland.

3.      Defendant State of Maryland is the authority under which Defendant Maryland Department of Safety and Correctional Services operates. At all times relevant to the facts and claims in this case, the State employed the Plaintiffs.

4.      Defendant Maryland Department of Public Safety and Correctional Services is an agency of Defendant State of Maryland. At all times relevant to the facts and claims in this case, the Maryland Department of Public Safety and Correctional Services employed the Plaintiffs.

### Facts Common to All Counts

5.      Kristle Autrey was employed as a correctional officer by the State of Maryland and Maryland Department of Public Safety and Correctional Services.

6.      Ms. Autrey worked as a correctional officer at the Brockbridge Correctional Facility in Jessup, Maryland.

7.      Ms. Autrey, who is white, was treated in all material respects as any other correctional officer until September 2011 when her co-workers and supervisors learned that she was in an interracial relation with a co-worker, Plaintiff Corporal Adrean Morris, who is black.

8.      Cpl. Morris and Ms. Autrey are now married.

9.      Beginning in September 2011, Ms. Autrey was subjected to severe harassment and discrimination because of her interracial relationship with Cpl. Morris.

10.     After learning that Ms. Autrey was in a relationship with Cpl. Morris, Ms. Autrey's principal supervisor—Captain Francine Davis—removed her from her recently-assigned position as Sanitation Officer.

11.     Sanitation Officer was one of the most sought-after positions in the facility.

12.     Capt. Davis removed Ms. Autrey from the position for no valid reason, stating that it was strictly a "sergeant's position."

13.     This was false, as other corporals have held this position in the facility for years. Nowhere in the facility policies did it state that only sergeants could work as sanitation officers.

14.     Capt. Davis and other supervisors began rigorously enforcing every requirement of the policy manual against only Ms. Autrey and Cpl. Morris. Meanwhile, other corporals were given wide latitude regarding their adherence to a variety of written policies.

15.     For example, Division of Correction Directives state that correctional officers are not to make or receive personal telephone calls while on duty. In Ms. Autrey's and Cpl. Morris's experience, officers on duty during the 10:00 p.m. to 6:00 a.m. shift regularly make and receive personal telephone calls. This common practice included Ms. Autrey's direct supervisor, Captain Davis.

16.     Other employees who were not in interracial relationships regularly made and received personal telephone calls directly in front of Capt. Davis's office without repercussion. Other officers who were stationed in the Traffic Office regularly made personal calls while on duty. Other officers who were stationed in towers regularly made personal telephone calls while on duty.

17.     Capt. Davis, herself, often spent much of her shift in her office or another office on personal telephone calls and ignored the fact that other officers were on personal telephone calls in front of her.

18.     When Capt. Davis learned that Ms. Autrey and Cpl. Morris were in an interracial relationship, she for the first time began enforcing the directive against personal telephone calls disproportionately against them.

19.     If Capt. Davis saw either Ms. Autrey or Cpl. Morris on a telephone, she shouted at them to get off the phone.

20.     Capt. Davis threatened to "write up" Ms. Autrey and Cpl. Morris or transfer them as punishment for allegedly making personal telephone calls.

21.     Capt. Davis also began calling the towers each time Ms. Autrey or Cpl. Morris was assigned to one, to check to see if the phone lines were busy.

22.     If a line was busy, Capt. Davis used her radio to angrily demand that Ms. Autrey or Cpl. Morris call her immediately. These radio transmissions could be heard by all the officers on duty.

23.     When Ms. Autrey or Cpl. Morris called Capt. Davis in response to her demand, she berated them for using the telephone while on duty.

4

24.     At the same time she was harassing Ms. Autrey and Cpl. Morris for alleged improper use of telephones, she continued to permit other officers to make personal telephone calls while on duty and continued to make personal telephone calls herself.

25.     Similarly, whereas officers were regularly allowed a certain amount of leeway with respect to lunch breaks and other breaks, Capt. Davis monitored Ms. Autrey's breaks to the minute.

26.     As soon as Ms. Autrey left her post, Capt. Davis called the post to find out what time she left and why.

27.     If Ms. Autrey was even one minute late in returning to her post, Capt. Davis called her on the radio and angrily shouted at her to return to her post.

28.     These radio transmissions could be heard by all the officers on the shift.

29.     In contrast, other officers were permitted to take as much as an extra thirty minutes for their lunch breaks, without repercussion.

30.     Capt. Davis was well aware and approved of this practice by other officers, but closely monitored Ms. Autrey's breaks.

31.     Officers have also been regularly permitted to eat at their posts, and to "hang out" with each other at the Traffic Office in the facility. Capt. Davis approved of and participated in these activities.

32.     With respect to Ms. Autrey, however, if Capt. Davis learned that she was eating her lunch at Cpl. Morris's post, she would demand that she leave his post immediately.

33.     On one such occasion, Capt. Davis called Ms. Autrey into her office and berated her for eating lunch at Cpl. Morris's post.

34.     Capt. Davis said that it "sickens me" to see Ms. Autrey and Cpl. Morris together.

35.     She threatened Ms. Autrey that she better never see her eating at Cpl. Morris's post again.

36.     Other officers, including Sergeant Faith Fennoy, discriminated against Ms. Autrey and Cpl. Morris by intentionally failing to relieve them for lunch in a timely manner. The result was that their lunch breaks were often cut short.

37.     Ms. Autrey and Cpl. Morris were regularly chastised in front of the other officers during "roll call" at the outset of the shift.

38.     With respect to other officers in the facility, if there was a complaint about their performance, supervisors met with them privately to address the issue.

39.     With respect to Ms. Autrey and Cpl. Morris, however, Capt. Davis, Lt. Donald Long, and/or Lt. Laster regularly announced complaints about their performance at roll call in front of the other officers.

40.     Capt. Davis, Lt. Long, and Lt. Laster regularly chastised and berated Ms. Autrey for allegedly going to Cpl. Morris's post instead of her own.

41.     These allegations were false and were intended to humiliate Ms. Autrey.

42.     On one occasion, Lt. Laster shouted such allegations at Ms. Autrey in front of other officers, and told her to "get your ass back to your post."

43.     Ms. Autrey was reduced to tears as a result of Lt. Laster's aggression.

44.     Capt. Davis, Lt. Long, and Lt. Laster also regularly harassed and berated Ms. Autrey for other alleged infractions.

45.     They frequently met with Ms. Autrey in their offices and shouted at her with the door open so that other officers could hear.

6

46.     Lt. Long frequently made derogatory comments about Ms. Autrey and Cpl. Morris's interracial relationship within earshot of Ms. Autrey and other officers.

47.     On one occasion, Lt. Long called Ms. Autrey's and Cpl. Morris's interracial relationship "disgusting."

48.     He also said that if Ms. Autrey became pregnant, it would be "disgusting."

49.     On multiple occasions, when Ms. Autrey and Cpl. Morris submitted leave requests, Lt. Long made sexually-explicit statements within earshot of Ms. Autrey.

50.     On one occasion, Lt. Long said to Ms. Autrey: "Are you on birth control? I hope you're on birth control because you know if your white ass gets pregnant by him he's just going to leave you and have nothing to do with the kid. That's what black men do."

51.     On another occasion, Lt. Long said to Ms. Autrey: "Why are you with him? You have such nice hair and his hair is so nappy."

52.     On another occasion, Lt. Long said to Ms. Autrey: "It's disgusting that you two are together. He's old enough to be your dad."

53.     On another occasion, Lt. Long said to Ms. Autrey: "You know no white men will ever sleep with you now that you've been with that black man."

54.     On another occasion, Lt. Long said to Ms. Autrey: "You know your baby daddy will take your children away once he finds out a black man is raising his kids."

55.     This and similar harassment continued for months after Capt. Davis, Lt. Long, and Lt. Laster learned of Ms. Autrey's and Cpl. Morris's interracial relationship.

56.     There were at least three other couples on the shift who were dating, but whose relationships were not interracial, and they did not suffer discrimination, harassment, or treatment similar to that of Ms. Autrey and Cpl. Morris.

57.     In or around March 2012, Ms. Autrey met with Capt. Davis in her office and complained about the ongoing harassment and discrimination. Ms. Autrey complained to Capt. Davis that she was not treating her and Cpl. Morris equally to the other officers in the facility.

58.     Ms. Autrey complained specifically about Capt. Davis's disparate treatment and unfair enforcement of the telephone policy.

59.     Capt. Davis reacted angrily; she began yelling and screaming at Ms. Autrey.

60.     She threatened Ms. Autrey with a transfer or shift change.

61.     Capt. Davis, who is black, shouted to Ms. Autrey to "shut up," "mind your own business," "get your white ass out of my office," and "return to your post."

62.     Ms. Autrey returned to her post, but was shaking and crying as a result of Capt. Davis's verbal abuse.

63.     Approximately an hour later, Lt. Laster saw Ms. Autrey crying and began shouting at her. He berated Ms. Autrey, saying that her crying on the job was unprofessional. He instructed her to leave work and take a sick day.

64.     Approximately ten minutes later, Capt. Davis summoned Ms. Autrey to her office.

65.     When Ms. Autrey arrived at Capt. Davis's office, she grabbed her by the arm and forced her into the women's bathroom, shut the door, and locked it.

66.     Capt. Davis blocked the only exit from the room and began shouting and screaming at Ms. Autrey.

67.     Capt. Davis shouted that the only reason she was treating Ms. Autrey that way was that she was the only white female on the shift and she was "trying to show you how the real world works when dealing with a black man."

8

68.     Capt. Davis threatened to have both Ms. Autrey and Cpl. Morris transferred to different shifts.

69.     Capt. Davis was aware that a threat of shift change was uniquely harmful to Ms. Autrey because she had child-care responsibilities during the day and it would be impossible for her to work another shift.

70.     When Ms. Autrey attempted to leave the room, Capt. Davis blocked her exit and continued shouting that Ms. Autrey and Cpl. Morris were a "security risk" and stating that she would not tolerate their relationship.

71.     Capt. Davis finally unlocked the door and slammed it open. She shouted at Ms. Autrey to return to her post. Ms. Autrey was sobbing as she walked back to her post. Capt. Davis followed closely behind her, continuing to shout at her.

72.     The following night, Ms. Autrey asked Lt. Laster for a referral to the Employee Assistance Program so that she could make a complaint about the ongoing harassment.

73.     Lt. Laster refused to give her a referral or assist her in any way. Instead, he threatened her that Capt. Davis could "do whatever it is she wants to do" and "there is nothing you can do about it."

74.     Lt. Laster told Ms. Autrey that he did not think she was being harassed and if she did not like her treatment she should transfer to a different shift.

75.     On March 5, 2012, Ms. Autrey filed an Internal Complaint of Discrimination/Unfair Employment Practices.

76.     On March 8, 2012, Cpl. Morris also filed an Internal Complaint of Discrimination/Unfair Employment Practices.

77.     On March 8, 2012, Cpl. Morris was issued a Written Counseling form by Capt. Davis. The counseling form was baseless. It was done in retaliation for his filing of an internal EEO complaint.

78.     On March 9, 2012, Ms. Autrey received a shift change transfer notice from Capt. Davis.

79.     Capt. Davis knew that Ms. Autrey could not work any other shift because of her child-care responsibilities and that this shift change notice would be extraordinarily harmful to her. The attempted shift change motivated by discrimination against Ms. Autrey for her interracial relationship with Cpl. Morris and retaliation for her filing of an internal complaint against Capt. Davis.

80.     On March 19, 2012, the day before the shift change was to take effect, Ms. Autrey received another notice stating that the shift reassignment "has been rescinded until further notice," leaving open the possibility of another discriminatory or retaliatory shift change in the future.

81.     Capt. Davis was transferred to another facility, but the harassment and discrimination of Ms. Autrey and Cpl. Morris continued under the new supervisors.

82.     In May 2012, Ms. Autrey took FMLA leave due to the physical, mental, and emotional stress and harm as a result of the months of harassment and discrimination she had endured.

83.     On August 3, 2012, Cpl. Morris was issued another Written Counseling form by Lt. Buress.

84.     Cpl. Morris filed an internal complaint regarding this retaliatory write-up.

85.     The Department's Office of Equal Opportunity found No Probable Cause on the alleged basis that "the Written Complaint issued by Lt. Buress had been removed from [Officer Morris's] personnel file therefore making [his] complaint moot."

86.     The assertion that the Written Counseling had been removed from Officer Morris's file was false. As of October 13, 2012, the Written Counseling by Capt. Davis and the Written Counseling by Lt. Buress were still in Cpl. Morris's personnel file.

87.     While Ms. Autrey was out on FMLA leave, she learned of the continued harassment, discrimination, and retaliation against Cpl. Morris.

88.     Ms. Autrey feared that if she returned to work she would again be subjected to severe harassment, discrimination, and retaliation.

89.     In or around September 2012, Ms. Autrey was terminated from her employment by the State of Maryland and the Maryland Department of Public Safety and Correctional Services.

90.     Cpl. Morris remains employed by the State of Maryland and the Maryland Department of Public Safety and Correctional Services.

91.     Plaintiffs exhausted all required administrative remedies before filing this action.

**Count I**
**(Title VII of the Civil Rights Act of 1964 – Race Discrimination)**

92.     The Plaintiffs incorporate by reference the substance of all the foregoing factual allegations.

93.     Plaintiffs' job performances have been fully satisfactory and they have not been subject to any valid disciplinary action.

94.     Cpl. Morris is black, a protected class under Title VII.

11

95.     Ms. Autrey, who is white, is in a protected class under Title VII because she is in an interracial relationship with Cpl. Morris.

96.     Plaintiffs have been treated less favorably than their co-workers with respect to the terms and conditions of their employment because they are in an interracial relationship.

97.     Similarly-situated officers who are not in interracial relationships have received more favorable treatment than Plaintiffs because Plaintiffs are in an interracial relationship.

98.     Both Ms. Autrey and Cpl. Morris were severely harassed because of their interracial relationship.

99.     The harassment of Ms. Autrey and Cpl. Morris was so severe that it effectively changed the terms and conditions of their employment.

100.    Cpl. Morris received a Written Counseling from Capt. Davis and a Written Counseling from Lt. Buress because of his interracial relationship with Ms. Autrey.

101.    Ms. Autrey's shift was changed because she was in an interracial relationship.

102.    Ms. Autrey was terminated because of her interracial relationship with Cpl. Morris.

103.    Plaintiffs had other tangible job detriments taken against them.

104.    These adverse employment actions and tangible job detriments were taken against Plaintiffs because they are in an interracial relationship.

105.    Defendant's disparate treatment of Plaintiffs, adverse actions against Plaintiffs, and other tangible job detriments taken against Plaintiffs were motivated by Plaintiffs' races in violation of 42 U.S.C. §§ 2000(e) et seq., Title VII of the Civil Rights Act of 1964, which prohibits any and all employment related decisions to be made based upon an employee's race.

106.    As a result of Defendant's unlawful action, Plaintiffs have suffered economic and non-economic damages.

WHEREFORE, the Plaintiffs demand:

a.       That the Court enter judgment in favor of Plaintiffs and against Defendants;

b.       That the Court award Plaintiffs damages in an amount to be proven at trial, but in no event less than $1,000,000.00.

c.       That the Court award Plaintiffs their attorneys' fees and costs incurred in this litigation; and

d.       That this Court award the Plaintiffs such other and further relief as in law and justice they may be entitled to receive.

<h3 style="text-align:center">Count II<br>(Title VII of the Civil Rights Act of 1964 –<br>Racially Hostile Work Environment)</h3>

107.     The Plaintiffs incorporate by reference the substance of all the foregoing factual allegations.

108.     In perpetrating the above-described actions, Defendants and/or their agents and employees engaged in a continuing and ongoing pattern and practice of unlawful racial harassment in violation of 42 U.S.C. §§ 2000(e) et. seq., Title VII of the Civil Rights Act of 1964

109.     Defendants and/or their agents and employees harassed Plaintiffs because of their races and interracial relationship and/or failed to take immediate and appropriate corrective action.

110.     Under Title VII, harassment of a person because the person is in an interracial relationship is considered harassment based on race.

111.     Among other harassment, Plaintiffs were aggressively yelled at and berated by Capt. Davis for making personal phone calls, while Capt. Davis let others use the phones for personal calls; they were regularly yelled at and chastised in front of others during "roll call"; they were regularly harassed and berated by their supervisors for alleged infractions; and their supervisors

made derogatory and sexually-explicit comments about their interracial relationship within earshot of them and other officers.

112.    When Ms. Autrey met with Capt. Davis in or around March 2012, Capt. Davis screamed at her; she threatened a shift change; and she grabbed her by the arm, forced her into the woman's bathroom, blocked her from leaving, and continued to shout at her.

113.    Cpl. Morris was issued two Written Counseling forms from his supervisors. These forms were issued as a means of discriminating against him and harassing him.

114.    Even after Capt. Davis was transferred to another facility, the harassment continued under the new supervisors.

115.    The harassment of Plaintiffs was sufficiently pervasive and severe as to alter the terms and conditions of Plaintiffs' employment, and created a hostile, intimidating, and/or abusive work environment.

116.    This harassment of Ms. Autrey and Cpl. Morris caused them to suffer severe mental and emotional distress.

117.    As a result of Defendants' unlawful actions, Plaintiffs have suffered economic and non-economic damages.

WHEREFORE, the Plaintiffs demand:

a.    That the Court enter judgment in favor of Plaintiffs and against Defendants;

b.    That the Court award Plaintiffs damages in an amount to be proven at trial, but in no event less than $1,000,000.00.

c.    That the Court award Plaintiffs their attorneys' fees and costs incurred in this litigation; and

d.      That this Court award the Plaintiffs such other and further relief as in law and justice they may be entitled to receive.

## Count III
## (Race Discrimination – 42 U.S.C. § 1981)

118.    The Plaintiffs incorporate by reference the substance of all the foregoing factual allegations.

119.    42 U.S.C. § 1981 prohibits race discrimination in the making and enforcement of employment contracts.

120.    Plaintiffs had employment contracts with Defendants.

121.    In the alternative, Plaintiffs were at-will employees of Defendants, which is a contractual relationship.

122.    Plaintiffs were treated less favorably than co-workers with respect to the terms and conditions of their employment because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

123.    Similarly-situated officers who were not in interracial relationships received more favorable treatment than Plaintiffs because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

124.    Only Plaintiffs were yelled at for using the telephones for personal calls, though their co-workers and supervisors frequently did so.

125.    Only Plaintiffs were berated for eating lunch together, even though their co-workers were permitted to eat at their posts and "hang out" together.

15

126.    Ms. Autrey was subjected to adverse employment actions when she was severely harassed, when she received notice that her shift had changed to a time she was unable to work, and when she was terminated.

127.    Cpl. Morris was subjected to adverse employment actions when he was issued two write-ups and was severely harassed.

128.    Plaintiffs had other tangible job detriments taken against them.

129.    These adverse employment actions and tangible job detriments were taken against Plaintiffs because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

130.    In perpetrating the above-described actions, Defendants and/or their agents and employees engaged in a continuing and ongoing pattern and practice of unlawful racial harassment.

131.    Defendants and/or their agents and employees harassed Plaintiffs because of their races and interracial relationship and/or failed to take immediate and appropriate corrective action.

132.    The harassment of Plaintiffs was sufficiently pervasive and severe as to alter the terms and conditions of their employment, and created a hostile, intimidating, and/or abusive work environment.

133.    Defendants' harassment of Plaintiffs, disparate treatment of Plaintiffs, adverse actions against Plaintiffs, and other tangible job detriments taken against Plaintiffs were motivated by Plaintiffs' races in violation 42 U.S.C. § 1981, which prohibits any and all employment-related decisions to be made based upon an employee's race and prohibits unequal enforcement of an employer's policies based upon race.

134.    As a result of Defendant's unlawful actions, Plaintiffs have suffered economic and non-economic damages.

16

WHEREFORE, the Plaintiffs demand:

a.        That the Court enter judgment in favor of Plaintiffs and against Defendants;

b.        That the Court award Plaintiffs damages in an amount to be proven at trial, but in no event less than $1,000,000.00.

c.        That the Court award Plaintiffs their attorneys' fees and costs incurred in this litigation; and

d.        That this Court award the Plaintiffs such other and further relief as in law and justice they may be entitled to receive.

## Count IV
### (Retaliation)

135.     The Plaintiffs incorporate by reference the substance of all the foregoing factual allegations.

136.     Plaintiffs' filing of internal complaints of discrimination constitute protected activity under Title VII.

137.     Plaintiffs' filing of Charges of Discrimination in the Maryland Commission on Civil Rights and the U.S. Equal Employment Opportunity Commission constitute protective activity under Title VII.

138.     Ms. Autrey filed an Internal Complaint of Discrimination/Unfair Employment Practices on March 5, 2012.

139.     Cpl. Morris filed an Internal Complaint of Discrimination/Unfair Employment Practices on March 8, 2012.

140.     Plaintiffs filed Charges of Discrimination in the Maryland Commission on Civil Rights and the U.S. Equal Employment Opportunity Commission.

141.    Just four days after she filed her internal complaint, Ms. Autrey's shift was changed from the night shift to a 2:00–10:00 p.m. shift.

142.    This shift change was retaliation for Ms. Autrey's filing of the internal complaint, as it was well-known to her supervisors that she had child-care responsibilities during the day and could not work the daytime shift.

143.    Ms. Autrey's termination in September 2012 was in retaliation for her protected activity.

144.    As a result of his filing of an internal complaint, Cpl. Morris was issued a Written Counseling form by Capt. Davis.

145.    After the filing of these internal complaints, Plaintiffs continued to be harassed and discriminated against by their supervisors and the new supervisors that replaced Capt. Davis.

146.    Cpl. Morris received a second retaliatory write-up in August 2012.

147.    Plaintiffs repeatedly complained to their superiors of unlawful and discriminatory conduct.

148.    These internal and informal complaints constitute protected activity under Title VII.

149.    After Plaintiffs engaged in the above-referenced protected activity, they were subjected to race discrimination, a racially hostile work environment, disparate treatment, and adverse employment actions.

150.    Plaintiffs have been treated less favorably than co-workers with respect to the terms and conditions of their employment because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

151.    Similarly-situated officers who are not in interracial relationships have received more favorable treatment than Plaintiffs because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

152.    Plaintiffs had other tangible job detriments taken against them.

153.    These adverse employment actions and tangible job detriments were taken against Plaintiffs because Cpl. Morris is black, Ms. Autrey is white, and they are in an interracial relationship.

154.    Defendants have a policy, pattern, or practice of disparate treatment of officers in interracial relationships.

155.    In perpetrating the above-described actions, Defendants and/or their agents and employees engaged in a continuing and ongoing pattern and practice of unlawful racial harassment.

156.    Defendants and/or their agents and employees harassed Plaintiffs because of their interracial relationship and/or failed to take immediate and appropriate corrective action.

157.    The harassment of Plaintiffs was sufficiently pervasive and severe as to alter the terms and conditions of Plaintiffs' employment, and created a hostile, intimidating, and/or abusive work environment.

158.    As employees of Defendants, Plaintiffs were entitled to protections under Title VII of the Civil Rights Act of 1964, including protected activity such as reporting racial hostility in the workplace, objecting to racial hostility in the workplace, objecting to racial discrimination, making internal complaints of racial discrimination and harassment, and filing a charge of discrimination in the Equal Employment Opportunity Commission.

159.    Upon Plaintiffs' engagement in the above-described protected activity, Defendants retaliated against Plaintiffs by harassing them and taking adverse actions against them.

160.    As a result of Defendants' unlawful actions, Plaintiffs have suffered economic and non-economic damages.

WHEREFORE, the Plaintiffs demand:

a.      That the Court enter judgment in favor of Plaintiffs and against Defendants;

b.      That the Court award Plaintiffs damages in an amount to be proven at trial, but in no event less than $1,000,000.00.

c.      That the Court award Plaintiffs their attorneys' fees and costs incurred in this litigation; and

d.      That this Court award the Plaintiffs such other and further relief as in law and justice they may be entitled to receive.

## JURY DEMAND

COMES NOW the Plaintiffs, Kristle Autrey and Adrean Morris, by counsel, and demand a trial by jury as to all issues triable by jury in this matter.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

_____/S/_____
Jay P. Holland (Bar No. 42258)
Joseph M. Creed (Bar No. 17134)
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200
*Counsel for Plaintiffs*